# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 15, 2012

Lyle W. Cayce
Clerk

No. 10-30233

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

KENNETH EARL WINES, also known as Crazy,

Defendant – Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before JOLLY, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal is from the denial of relief under 28 U.S.C. § 2255. The § 2255 motion asserts a claim that trial counsel rendered ineffective assistance by advising the appellant, Kenneth Earl Wines, not to testify in his federal criminal trial. Because he fails to demonstrate that he was prejudiced, Wines has not established a constitutional violation and is not entitled to § 2255 relief. We therefore affirm the judgment of the district court.

No. 10-30233

I.

A.

We first recount the evidence presented at Wines's criminal trial at which he was convicted by a jury. We will later deal with his § 2255 evidentiary hearing.

On September 30, 2002, sometime after three in the morning, in West Monroe, Louisiana, Marvin Chappell, a co-conspirator, was driving a Ford Expedition, belonging to Wines's stepfather, a resident of Dallas, Texas. An Ouachita Parish sheriff's deputy pulled over Chappell, and Chappell consented to a search of the vehicle. The sheriff's deputy found nine ounces of crack cocaine hidden in the vehicle's sound speakers. Officers questioned Chappell, who told them that the drugs belonged to a man named "Crazy." Chappell agreed to cooperate with the sheriff's department to lure "Crazy" to a nearby truck stop, through the ruse of telling him that the Expedition had broken down there.

In order to contact "Crazy," Chappell called a "girl named Felicia." Then, Felicia made a three-way call to Wines's phone. Wines handed the phone to Bernice Woodson, Wines's long-time friend and co-conspirator; and Chappell informed Woodson of his car troubles. Wines, Woodson, and Aurora Shine – Woodson's girlfriend – arrived at the truck stop parking lot in the same rental car. After the group talked to Chappell about the breakdown, they drove away to a nearby gas station. Once the group arrived at the gas station, Woodson exited the car, walked back toward Chappell at the truck stop, and began talking to an undercover officer, who was posing as an auto mechanic. As Woodson was talking to the undercover agent, Wines and Shine drove away, leaving Woodson stranded at the truck stop. Woodson was arrested at the truck stop, and the officers, following Wines's and Shine's car, arrested them.

2

No. 10-30233

Ouachita Parish Sheriff's Department Deputy Bob Morris testified at trial that, upon arrest, Chappell knew Wines by the name of "Crazy" and that Chappell identified Wines as his Dallas-area drug supplier. Further, Woodson, upon arrest, affirmatively identified Wines as the group's supplier.

After he was arrested, Woodson told agents the location of Wines's house in Dallas and that Wines kept several firearms in the house. Dallas County Sheriff's Department officers searched the home at 1651 Blue Meadow Street and seized 262 grams of crack cocaine, 226 grams of marijuana, two digital scales, seven firearms, and $31,110 in cash. During the search, the Sheriff's Department officers found a rent receipt for the house made out to "Tyrone Davis."

In 2004, Wines was indicted for conspiracy with intent to distribute cocaine base (count1), conspiracy to distribute marijuana (count 2), possession with intent to distribute cocaine base (count 3), and possession of a firearm in furtherance of and in relation to a drug trafficking crime (count 4).

B.

At the criminal trial that followed, Woodson testified that the night before the arrests he was at Wines's house at 1651 Blue Meadow Street. He said that he watched Wines cook crack cocaine and, then, Wines hid the cocaine in the speaker box of the Expedition, which Chappell was driving. Chappell left that night for Lake Providence, Louisiana. Wines and Woodson were not too far behind Chappell, because they both had a mandatory criminal court appearance in Monroe, Louisiana at ten o'clock the next day, apparently concerning a marijuana charge committed in the area, which included Lake Providence.

According to Woodson, he had once been the "big man" in a drug conspiracy and was ten years older than Wines. However, because of his multiple stints in prison and his large amount of attorney's fees, Woodson had lost his drug kingpin status and was working for Wines at the time of the

3

incident. Woodson further testified that although the men had known each other for more than a decade, they had lost touch for quite a while. They reunited during a chance encounter at a gas station, and Wines recruited Woodson to drive him to Lake Providence, Louisiana to sell crack cocaine and marijuana.

Altogether, the men took at least nine of these interstate, drug-selling road trips to the Lake Providence area before they were arrested on the present charges. Woodson testified that he introduced Wines to Chappell, a man who fathered a baby with Woodson's sister. After he was recruited into the operation, Chappell assumed responsibility for transporting the drugs to Lake Providence.

In addition to Woodson, the owner of the house at 1651 Blue Meadow Street, Lorene Smith, testified for the government. Smith said that she had leased the home to "Tyrone Davis," that she had met "Tyrone Davis" four times, and that she received payment for the rent through money order from him. She specifically identified Wines as "Tyrone Davis."

After the prosecution rested, the defense presented its case. Wines's defense attorney called only two witnesses: Chappell, who invoked his right to remain silent under the Fifth Amendment, and Erma Wines, Wines's mother. The defense attorney did not call Wines to testify.

Erma Wines, who also lived in Dallas, testified during direct examination that Wines had been living with her since March 2002, almost six months before the traffic stop in Ouachita Parish. She also said that she knew that Woodson and Chappell moved into the Blue Meadow house after Wines moved out and testified to seeing the men there playing dominoes on more than one occasion. She further testified that Wines had been at her house for a barbeque on the night before Wines's arrest until almost 2:30 a.m. and then he left for Monroe. When asked during cross-examination how she knew Woodson, she testified that she had met him in 1993 when Wines "got his . . . first case." She said that

No. 10-30233

Woodson and others gave Wines "a sack" and told him to "run with it and put it up." Wines's mother also said that the drug involved was cocaine and that Wines went to jail for the offense.

A jury found Wines guilty on all four counts: conspiracy with intent to distribute cocaine base, conspiracy to distribute marijuana, possession with intent to distribute cocaine base, and possession of a firearm in furtherance of and in relation to a drug trafficking crime. The district court sentenced him to 360 months of imprisonment on the first three counts, to be served concurrently, and sixty months of imprisonment on count 4, to be served consecutively. Thus, Wines was sentenced to a total of 420 months of imprisonment (35 years). Wines's conviction and sentence were affirmed by this court on direct appeal.[1]

## II.

We now turn to the § 2255 proceeding before us. After he exhausted his remedies on direct appeal, Wines filed a pro se 28 U.S.C. § 2255 motion in which he asserted that his trial counsel was ineffective for (1) failing to investigate Chappell; (2) failing to subpoena certain witnesses; (3) failing to question the fact that Woodson gave a written statement to law enforcement officers, despite Woodson admitting that he was unable to read or write; (4) failing to question the fact that all of the evidence against Wines was provided by Shine; (5) failing to adequately discuss Wines's case with him; (6) refusing to pursue courses of action at Wines's request; and (6) failing to call Wines to testify even though Wines instructed him to do so. In reply to the government's answer to his § 2255 motion, Wines further asserted that if he was allowed to testify, he would have informed the jury that he never traveled from Dallas to Louisiana with Chappell and that he and Chappell were "enemies." Wines also requested an evidentiary hearing.

---

[1] The district court later reduced Wines's sentence pursuant to 18 U.S.C. § 3582(c)(2) to 384 months (32 years).

No. 10-30233

The district court appointed the Federal Public Defender to represent Wines and granted Wines's request for an evidentiary hearing regarding his claim that his counsel was ineffective for failing to allow him to testify at trial.

At the evidentiary hearing, which was assigned to a magistrate judge, only two people testified: Wines and Wines's trial counsel, Walter Caldwell IV.

Wines testified that he was living at his mother's house in Dallas at the time of the incident at the Louisiana truck stop. He said that the night before his arrest in West Monroe, he was at his mother's house until almost 2:00 a.m. Almost an hour after the barbeque ended, Woodson arrived and asked Wines if he wanted to ride together to Monroe for their court appearance. Wines agreed, and the men traveled to Monroe for their court appearance without incident.

However, on their way out of court that morning in Monroe, someone called Wines's mobile phone and asked to speak to Woodson. After talking on the phone, Woodson asked if they could stop off in West Monroe, Louisiana to help a friend. Wines told him that was not a problem.

Once the men arrived – along with Shine – at the truck stop on Well Road, Woodson got out of the car to help his friend, Chappell, and then came back and said that he needed to be taken to a "part house" to get a part that was needed for the car Chappell was driving. The men could not find the "part house," so Woodson got out of the car and walked back to the truck stop. Wines then drove back toward Dallas with Shine but was soon arrested in West Monroe.

Wines further testified that he had lived in the Blue Meadow residence with his "baby mom," but they had separated and moved out, and Woodson moved in afterwards for about eight or nine months until the arrests. Wines also stated that his nickname was "K-Love," not "Crazy" and that he never used "Tyrone Davis" as an alias.

Wines testified that when he talked to his trial counsel about testifying, his lawyer told him that the government would bring up his prior convictions.

6

No. 10-30233

Wines explained that "a couple" of the offenses were committed by someone using his name, but he did admit to committing the 1992 or 1993 offense for possession of drugs with the intent to distribute.

Wines said that after all of the witnesses had testified, he asked his counsel whether he was going to allow him to take the stand, and his counsel responded that he was "comfortable" with the way things were progressing at trial. Wines stated that he told his trial lawyer that "he could at least give [Wines] a chance to fight for [his] life" because he was not confident with what he had seen. Although counsel told Wines that his past was an issue, Wines responded that his past was already known through his mother's testimony. Wines elaborated that he did not complain at trial about not being allowed to testify because he did not know that he could complain and, in any event, he did not know how to raise the issue on his own.

Wines testified that he did not make any statements to police after his arrest because he "wasn't aware of what was going on" and because he was "lost." He also denied knowing that Chappell had drugs in the car and denied assisting Chappell by loading the drugs into Wines's stepfather's Expedition.[2] Wines also said that he was prepared to testify at the time of trial and that he would have testified consistently with his evidentiary hearing testimony. He says that he would have told the jury that he was innocent.

Wines's trial counsel, Walter Caldwell IV, also testified at the evidentiary hearing. He said that he could not remember any specific conversations that he had with Wines during trial, but "I certainly know that at some point we

---

[2] Wines also explained that the reason that Chappell – whom Wines denied ever having any drug trafficking association with – was in possession of Wines's stepfather's truck was because Chappell was a shade-tree mechanic in Dallas and a friend of his stepfather's. Wines said that Chappell probably had the truck for repairs but did not attempt to explain why it was in West Monroe, loaded with nine ounces of crack cocaine.

probably discussed it and I probably advised him against it." Caldwell was sure that he had never told any of his clients that "[y]ou cannot testify" or that "[y]ou must testify." He continued that "I've always told that person, 'that's one of the decisions you get to make in this case is whether or not you testify." He understood that he "certainly" could not have "preclude[d] Mr. Wines from testifying at trial." Caldwell told the court that he had a preference against allowing his clients to testify because he has "found that individuals that tend to testify, a lot of times end up hanging themselves." He stated that if Wines had been called to testify, the government would have quickly asked him about his prior conviction of a drug-related charge. Additionally, there was no need for Wines to testify because he had not made any statements to the police that needed to be explained.

Ultimately, after hearing the testimony from both Wines and his trial attorney, the magistrate judge recommended that Wines's § 2255 motion be denied. The magistrate judge determined that Wines had not proved his counsel was ineffective for failing to call Wines to testify. The magistrate judge further determined that Wines had not overcome the strong presumption that his counsel's decision was the result of sound trial strategy, because evidence of Wines's prior convictions would have been introduced and there would have been a subsequent jury instruction reminding the jury about the convictions. The magistrate judge also found that even if trial counsel's decision was not sound trial strategy, Wines had not shown that he was prejudiced by counsel's failure to call Wines as a witness. Furthermore, the magistrate judge found that there were no other grounds upon which Wines was entitled to habeas relief.

The district court adopted the magistrate judge's Report and Recommendation, almost in its entirety, and denied Wines's §2255 motion.

In addition to denying Wines's § 2255 motion, the district court denied Wines a certificate of appealability ("COA"). Wines then sought a COA from this

No. 10-30233

court. We concluded that Wines had not shown that the record supported a determination that his counsel prevented him from testifying at trial. We held, however, that Wines had shown that reasonable jurists would find it debatable whether the district court committed reversible error when it determined that Wines's counsel was not ineffective for advising him not to testify at trial.

Thus, the only issue before the panel at this time is whether Wines's trial counsel rendered ineffective assistance by advising him not to testify on his own behalf.

### III.

In determining whether counsel's performance was ineffective, we apply the familiar test of *Strickland v. Washington,* 466 U.S. 668 (1984). *See Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). To establish that counsel was ineffective, the defendant must prove: (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" *Strickland*, 466 U.S. at 687 and (2) "that the deficient performance prejudiced the defense." *Id.* To prove that trial counsel's deficient performance prejudiced the defense, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome [of a criminal trial]." *Id.* This is a heavy burden which requires a "substantial," and not just a "conceivable," likelihood of a different result. *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011); *see also Cullen v. Pinholster,* 131 S. Ct. 1388, 1403 (2011).

To save ink, paper, and time, we will assume, without deciding, that Wines's trial counsel performed deficiently, because even assuming Wines's counsel was ineffective, Wines suffered no prejudice.

9

No. 10-30233

At the outset, we should note that Wines was convicted of conspiracy to possess with intent to distribute cocaine base (count 1)[3] and conspiracy to distribute marijuana (count 2).[4] [5]    Significantly, at the evidentiary hearing, Wines offered no defense that would have addressed these convictions except to the extent that they involved the September 30 arrests.  For example, in the indictment, the government alleged that the conspiracy involving Wines as well as unnamed others started in 1998 and continued until 2002.  Thus, the conspiracy significantly preceded the discovery of nine ounces of crack cocaine in Wines's stepfather's car and the co-conspirators' consequent arrests in West Monroe.  In fact, Woodson testified at trial that Wines approached him at a gas station to travel with him to Lake Providence and conduct a drug business.  Woodson further testified that he took at least nine trips to Lake Providence with Wines to deal drugs.  Wines does not purport to deny this drug conspiracy.  Wines's proposed testimony only denies that he had traveled with Chappell to Louisiana to sell drugs. Thus, even if Wines had testified, these convictions would remain unchallenged.

---

[3] Count 1 of the superseding indictment alleged that, "[b]eginning sometime in 1998 . . . and continuing through September 30, 2002, in the Western District of Louisiana and elsewhere, the defendant, KENNETH EARL WINES, a.k.a. 'Crazy', and other persons both known and unknown . . . did knowingly and intentionally conspire and agree together to distribute 50 grams or more of a mixture or substance containing a detectible amount of cocaine base, otherwise known as crack cocaine."

[4] Count 2 of the superseding indictment alleged that, "[b]eginning sometime in 1998 . . . and continuing through September 30, 2002, in the Western District of Louisiana and elsewhere, the defendant, KENNETH EARL WINES, a.k.a. 'Crazy', and other persons both known and unknown . . . did knowingly and intentionally conspire and agree together to distribute a mixture or substance containing a detectable amount of marijuana."

[5] At sentencing, the district court determined that Wines should serve his sentences for both of these counts concurrently with his conviction for possession with the intent to distribute cocaine base (count 3); the only sentence Wines must serve consecutively is his sentence for possession of a firearm in furtherance of a drug trafficking crime (count 4).

No. 10-30233

We now turn to examine Wines's testimony regarding his convictions for the September 30, 2002 possession with the intent to distribute cocaine base conviction (count 3) and the possession of a firearm in furtherance of a drug trafficking crime conviction (count 4).

First, if he testified in his own defense at trial, Wines's credibility would have undergone a scorching cross-examination. Wines would have had to admit that he was in the illicit drug business and that Woodson was his good friend and associate, and he would have had to answer to his longtime drug dealing in Lake Providence. Prosecutors would have introduced impeachment evidence of his conviction for possession with intent to distribute cocaine. Although his mother had already mentioned that he had previously been "busted" for cocaine, the prosecutors would have been able to further attack his credibility by introducing evidence of his conviction for the offense, the name of the offense, and the sentence imposed. Although Wines argues that the cat was already out of the bag regarding this conviction, he had a whole clowder of cats in the bag that had yet to escape. In addition to Wines's 1993 possession with intent to distribute cocaine conviction, Wines's pre-sentence report reveals other convictions that show a pattern of his illegal behavior that would have been available to challenge the credibility of his innocence plea, including: convictions in 1999 and 2000 for unlawfully carrying a weapon, a 1997 conviction for evading arrest, a 2001 conviction for possession of marijuana, and a 2000 conviction for assault.[6] Wines claims that he was innocent of some of these convictions, because "[s]omebody was using my identity." Given that the process of convicting a defendant involves finger-printing, computer checks, and other modern technology designed to authenticate the identity of a defendant,

---

[6] Wines claims that he was not responsible for some of these convictions. During the evidentiary hearing Wines claimed, "Somebody was using my identity. There's a couple of them I didn't know nothing about."

Wines's assertion that someone else was convicted under his name of the offenses listed in his pre-sentence report would undoubtedly cast him as a deceitful witness.

Furthermore, outside of his bare assertions of innocence of these particular charges, Wines's account of events given at the evidentiary hearing was, in large part, cumulative of the record already established at his trial; and it is clear that failing to introduce cumulative evidence at trial does not give rise to *Strickland* prejudice.  *See Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009); *see also Nobles v. Johnson*, 127 F.3d 409, 419 (5th Cir. 1997).  For example, most of the testimony Wines says he would have given at the criminal trial focused on denying his involvement with the house at 1651 Blue Meadow Street, where the drugs, guns , and money – the physical evidence underlying his convictions and sentences – were found; however, his mother, who, from all accounts was a normal citizen with no criminal record, had already related the relevant parts of Wines's evidentiary hearing testimony regarding the Blue Meadow house:  that Wines had not lived there for six months, that Chappell and Woodson moved into the home after Wines moved out, and that Wines was living with her at the time of the Ouachita Parish arrests.  She also corroborated Wines's claim that he was not cooking crack cocaine with Woodson the night before the arrests and instead was attending a barbeque at her house.  In other words, Wines's alibi was provided by a witness with fewer credibility issues, and the jury chose not to believe the alibi. Ultimately, because Wines's testimony would have been largely cumulative, Wines's defense was not prejudiced.

Still further, Wines's version of some events contradicts his mother's testimony at trial.  Most significantly, Wines's mother testified that she knew all along that Wines would be traveling to Louisiana with Woodson for their court appearance. On the other hand, Wines testified that he did not decide to go with Woodson to Louisiana until after the barbeque. This inconsistency could

No. 10-30233

easily have been exposed to be an attempt to distance himself from Woodson, and it would have not only undermined his credibility but it would have challenged his mother's testimony as well.

As we earlier noted, proving prejudice under *Strickland* is a heavy burden. Indeed, as far as we can determine, no defendant in any court in the United States has been able to prove *Strickland* prejudice on the basis of his counsel advising him not to testify in his own defense at trial.  Wines fails to establish an exception to this record.  We therefore conclude that, even if Wines's counsel was deficient in advising Wines not to testify at trial, his counsel's error could not be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

IV.

In sum, Wines has failed to prove a constitutional claim for ineffective assistance of counsel, because he has not established prejudice under the *Strickland* test.  Because the district court committed no reversible error, the district's court's judgment, denying Wines's § 2255 motion is

AFFIRMED.

13

No. 10-30233

HIGGINBOTHAM, Circuit Judge, dissenting:

Without context, defense counsel's decision to not put Wines on the stand is surely faultless because the introduction of a prior conviction will often take the air from a defense. And, ordinarily, such a decision would not prejudice the defendant. But here context is critical and alters the ordinary calculus in two ways: the government's case turned on the credibility of a multiple felon testifying under a plea deal, and Wines's prior criminal conduct was already before the jury when the decision not to call him as a witness was made. All turned on the jury choice between Wines's account and that of his alleged co-conspirator. Yet defense counsel did not put Wines on the stand to tell his side. Given the posture of the trial and – significantly – the fact that Wines's account was both plausible and exculpatory, I am persuaded that counsel's failure to call Wines was not an objectively reasonable strategic decision and that Wines was prejudiced. I therefore dissent.

## I.

## A.

It is important that we set the stage for defense counsel's controversial decision. I turn to that narrative.

Sometime after 3:00 a.m. on September 30, 2002, an Ouachita Parish Sheriff's deputy pulled over a pick-up truck that was being driven by Wines's co-defendant Marvin Chappell in Monroe, Louisiana. The deputy searched the vehicle and discovered crack cocaine hidden in a speaker compartment.

After the drugs were found, Chappell eventually agreed to lure the suppliers of the drugs to a truck stop on Well Road by telling them that the vehicle was broken down there. Chappell called "a girl named Felicia," who in turn made a three-way call to Wines and Bernice Woodson. Wines, Woodson, and Aurora Shine arrived at the truck stop parking lot, where Chappell told them about the supposed breakdown. Woodson, Wines, and Shine drove away.

14

No. 10-30233

They stopped at a gas station, and Woodson got out, walked back to the truck stop, and talked about the supposed breakdown to an undercover agent posing as a mechanic.  Woodson then started walking back to the gas station where he had left Wines and Shine. Before he arrived there, however, deputies observed Wines and Shine drive away.  Woodson was then arrested, and agents who had followed Wines and Shine arrested them as well.  According to one of the officers, Chappell did not appear to know Wines very well, but Chappell knew Woodson.

Ouachita Parish Sheriff's Office Deputy Bob Morris testified at trial that Chappell knew Wines by the name of "Crazy" and that Chappell identified Wines as his Dallas drug supplier.  However, Morris also testified that after Chappell named "Crazy," it was some time before Morris was able "to tie Kenneth Wines with the name 'Crazy.'"[1] In other words, contrary to the majority's summary of Morris's testimony, it is not clear whether Chappell himself ever linked Wines to the name "Crazy."  What is clear from the trial testimony is that Bernice Woodson identified Wines, by name, as the supplier.

Woodson told agents where Wines's house was located in Dallas and that Wines had several guns in the house.  Based on the information from Woodson, Dallas County Sheriff's Department officers searched a residence at 1651 Blue Meadow in Dallas, seizing crack cocaine, marijuana, two digital scales, several guns, and over $31,000 in cash.  They also found a rent receipt made out to "Tyrone Davis." The owner of the residence, Lorene Smith, testified at trial that she had leased the residence to Tyrone Davis, and she identified Wines as Tyrone Davis.

---

[1] No one at trial testified based on personal knowledge that Wines's nickname was "Crazy."  According to the trial transcript, Woodson testified that Wines's nickname was "Kayla," probably an incorrect transcription of "K-Love."

15

No. 10-30233

**B.**

The record offers two competing but plausible accounts for Wines's presence in the car with Woodson and Shine the day of their arrests.

According to Woodson's account, the night before the arrests, Woodson had watched Wines cook crack cocaine in Wines's kitchen in the house on Blue Meadow. Woodson and Wines then hid the crack cocaine in the speaker box of the truck driven by Chappell. Wines had recruited Woodson to drive him to Lake Providence, sell drugs with him while they were there, then drive Wines back to Dallas. They took a total of six, or maybe nine trips (Woodson's testimony at trial was unclear), some of which also included Chappell. Although Woodson had once been the "big man," he was now working for Wines. According to Woodson's story, he and Wines were traveling together after a court appearance the next morning so that Wines could take Woodson to Lake Providence "to meet up with Chappell to celebrate."[2]

According to Wines's account,[3] Wines and his "baby mom" had lived in the residence on Blue Meadow, but they eventually separated and moved out. Woodson, and not Wines, lived there for the eight or nine months preceding the arrests, and Wines had no longer had any connection to the house. On the evening before his arrest, Wines was at a barbecue at his mother's house at 9499 Brewster in Dallas, where he was living at the time. The barbecue ended at around 2:00 a.m., and about an hour later Woodson showed up and told him he wanted to ride with Wines to a court appearance they both had in Monroe. As they were about to leave the courthouse in Monroe later that morning, Wines got

---

[2] In its summary of Woodson's testimony, the majority states that "Wines and Woodson . . . both had a mandatory criminal court appearance in Monroe, Louisiana at ten o'clock . . ., apparently concerning a marijuana charge in the area, which included Lake Providence." The majority attempts to revise the record. Woodson did not say that the court appearance was "criminal," nor did he say that it concerned a "marijuana charge."

[3] As related at the evidentiary hearing on his § 2255 motion.

No. 10-30233

a phone call from someone who asked for Woodson. After talking to the person on the phone, Woodson told Wines that he wanted to go by Well Road in West Monroe on the way back to help a friend. Wines said that wasn't a problem.

At Well Road, Woodson got out to talk to his friend and then came back and said that Wines needed to drive him to a "part house." They drove down the street but did not see the part house. At that point, Wines said that he had to pick up his son from school and didn't have time to be driving around. Woodson asked Wines to take Woodson's girlfriend, Shine, back to Dallas. Wines did not make any statements to police after his arrest because he "wasn't aware of what was going on" and because he was "lost." He did not know what Chappell had in the pick-up truck, and he did not participate in helping Chappell get to the location where Chappell was arrested.

\* \* \*

This case turned on the jury's assessment of these two accounts, and the jury only heard one of them. Bernice Woodson's testimony was the crux of the government's case – the only evidence linking Wines to the drugs in the truck driven by Chappell – and other than the law enforcement personnel and the owner of the house on Blue Meadow, Woodson was the government's sole witness. Woodson testified pursuant to a plea agreement, in exchange for the dismissal of some charges and the possibility of the government filing a motion for a downward departure at sentencing.

The defense called just two witnesses, neither of them Wines. One of these witnesses was Chappell, who invoked his Fifth Amendment right against self-incrimination. The other defense witness was Wines's mother, Erma Wines.

Mrs. Wines testified that Wines had been living with her since March 2002; that only Chappell and Woodson lived in the residence on Blue Meadow; and that Wines had been at her house for a barbecue on the night before the incident until 2:30 a.m., when he left for Monroe. When she was asked during

17

direct examination how she had met Woodson, she testified that she had met him in 1993 when Wines "got his . . . first case." She said Woodson gave Wines "a sack" and told him to "run with it and put it up." Wines was then arrested and sent to jail. On cross-examination, when asked about Woodson's involvement in drugs, she testified that in 1992 or 1993 when Wines got "busted" at the age of 17 or 18, Woodson gave him drugs and told him to run with them during a drug bust. She further testified that Wines had been sent to jail and that the drug involved was cocaine.

The jury convicted Wines on all counts, and the conviction was affirmed on direct appeal.

## C.

Wines subsequently filed a pro se § 2255 motion in which he argued that his counsel was ineffective for (1) failing to investigate Chappell; (2) failing to subpoena certain witnesses; (3) failing to question the fact that Woodson gave a written statement despite being unable to read or write; (4) failing to question the fact that all of the evidence against Wines was provided by unindicted co-conspirator Shine; (5) failing to discuss Wines's case with him or pursue anything that Wines requested; and (6) failing to call Wines to testify even though Wines instructed counsel to do so. The district court granted Wines's request for an evidentiary hearing regarding, but not limited to, his claim that his counsel was ineffective for failing to allow him to testify at trial, and it appointed the Federal Public Defender to represent Wines at the hearing.

At the hearing, Wines told his version of the events leading up to his arrest, testifying to his lack of involvement in the alleged drug conspiracy.[4] He

---

[4] In its summary of Wines's testimony, the majority again rewrites the record to imply a closer connection between Wines and Chappell than Wines acknowledged, stating: "Wines also denied knowing that Chappell had drugs in the car and denied assisting Chappell by loading the drugs into Wines's stepfather's Expedition." On redirect, Wines's counsel asked whether he knew what Chappell had in the vehicle and whether he had helped Chappell. To

noted that his nickname was "K-Love," not "Crazy," and stated that Tyrone Davis was not his alias. Wines also gave his account of his interactions with counsel before, during, and after trial. William Caldwell IV was appointed as Wines's trial counsel. According to Wines, after Caldwell was appointed, they talked about his case twice. Wines said that Caldwell "never just talked about the direct trial," but that Caldwell "asked [Wines] a few questions." He never talked to Caldwell about the specifics of his testimony, although he did tell Caldwell about the facts surrounding his arrest.

Wines testified that when he talked to Caldwell about testifying, counsel told him that the Government would bring up his prior convictions. Wines stated that although the PSR outlined several convictions, "a couple" of the offenses were committed by someone else using his identity and that he was convicted in 1992 or 1993 for possession of drugs with intent to distribute. Wines said that he asked his counsel after all of the witnesses had testified whether counsel was going to allow him to take the stand, and counsel responded that he was "comfortable" with the way things were progressing at trial. Wines was asked why he didn't testify if he wanted to testify. He said:

---

both questions, Wines replied simply, "No, sir." In a different portion of his testimony, on direct examination by his counsel, Wines said that he now knew something about the vehicle Chappell was driving at the time of his arrest:

> Q. Mr. Chappel was driving the vehicle that was supposed to be broken down, is that right?
> A. Yes, sir.
> Q. Do you know anything about that vehicle?
> A. Yes. That's my step dad, my step daddy -- I guess Mr. Chappel my step daddy's friend somehow. But -- that's my step dad vehicle.
> Q. Do you know why Mr. Chappel had the vehicle?
> A. Because he's a mechanic. That's what I later found out, as far as I know.

Incidentally, the government has not argued that the latter details bear on Wines's ineffective assistance claim.

> I asked him. I wanted to testify. I told him – I told him on –I told him more than once. But he was telling me about my past. And I was like, "At this time, my past really don't make a difference."
> "My mom" – I knew she was going to tell the truth. That's just how she is. "My past is already really – it's already known."

Wines also stated during the hearing that he was ready to testify at the time of trial and that he would have testified consistently with his hearing testimony. If he had testified at trial, he would have told the jury that he was innocent.

Caldwell, Wines's trial counsel, testified that while he did not have "an independent recollection" of going to meet with Wines, he was sure he did. Caldwell did not recall any conversations that he had with Wines during trial. With regard to the possibility of Wines testifying, Caldwell stated, "I certainly know that at some point we probably discussed it and I probably advised him against it." Caldwell did not recall a conversation where Wines told him he wanted or did not want to testify, but he did know that he had never told anyone, "You cannot testify," or "You must testify." Caldwell explained that he has "found that individuals that tend to testify, a lot of times end up hanging themselves." He stated that if Wines had been called to testify, the Government would have quickly pointed out or asked him about his prior conviction of a drug-related charge. Additionally, he noted that Wines had not made any statements to police, so there was no need for him to testify to explain any such statements.

The magistrate judge ("MJ") recommended that Wines's § 2255 motion be denied. The MJ determined, *inter alia*, that Wines had not shown that his counsel was ineffective for failing to call him to testify. The MJ found that other than the self-serving assertions of Wines and Caldwell, the record was silent as to whether Caldwell prevented Wines from testifying, and thus Wines had not shown that counsel overrode his decision to testify. The MJ further determined that Wines had not overcome the strong presumption that his counsel's decision

not to call him to testify was the result of sound trial strategy because formal evidence of Wines's prior conviction and a jury instruction reminding the jury of the conviction would have come in if Wines had testified at trial.  The MJ also found that even if counsel's decision was not sound trial strategy, Wines had not shown that he was prejudiced by counsel's failure to call Wines as a witness.

The district court adopted the MJ's Report and Recommendation with the exception of the MJ's determination that "if Wines had testified, the government **could** have entered formal evidence of Wines' [prior] conviction [for possession with intent to deliver cocaine] into the record under Fed. R. Evid. 609(a)(1) and **would have been entitled** to jury instructions reminding the jury of Wines' prior conviction" and that "Wines' credibility **would have been impeached** by evidence of his prior conviction if he had testified at trial."[5] The district court noted that it was not clear from the record whether Wines's release from prison for the prior conviction was within ten years of his trial in this case. Thus, to introduce the prior conviction for impeachment purposes, the government would have had to present the court with evidence that Wines' release from prison had occurred less than ten years before, or the government would have had to convince the court that the probative value of the conviction substantially outweighed its prejudicial effect.  However, the district court concluded that Wines's prior conviction probably would have been admitted, had Wines testified.[6]

The district court denied Wines's petition and did not grant a certificate of appealability ("COA").  Wines then sought a COA from this court.  We

---

[5] *United States v. Wines*, No. 03-30013-01, 2010 WL 114225, at *1 (W.D. La. Jan. 11, 2010) ("*Wines II*").

[6] Although Wines's PSR listed additional prior convictions for minor crimes, the government does not suggest, and the district court did not find, that any of the alleged convictions other than Wines's 1993 drug conviction would have been introduced at trial. The majority's suggestion to the contrary is without support in the record.

concluded that Wines had not shown that the record supported a determination that his counsel prevented him from testifying at trial, but that he had shown that reasonable jurists would find debatable the district court's determination that his counsel was not ineffective for advising him not to testify at trial. We granted a COA on the issue of whether Wines's attorney was ineffective for advising him not to testify at trial.

## II.

In the 28 U.S.C. § 2255 context, this court reviews a district court's factual findings for clear error and its legal conclusions de novo.[7] Ineffective assistance of counsel claims present mixed questions of law and fact,[8] and we therefore review de novo the district court's resolution of Wines's claim.[9]

Under *Strickland*, the standard for ineffective assistance of counsel claims has two prongs. First, the defendant must establish that his counsel's performance was deficient.[10] "The proper measure of attorney performance [is] . . . reasonableness under prevailing professional norms."[11] Second, the defendant must demonstrate that his counsel's deficient performance prejudiced the defense.[12] To do so, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[7] *United States v. Cavitt*, 550 F.3d 430, 435 (5th Cir. 2008).

[8] *See Strickland v. Washington*, 466 U.S. 668, 698 (1984) ("[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.").

[9] *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002).

[10] *Strickland*, 466 U.S. at 687.

[11] *Id.* at 688.

[12] *Id.* at 687.

No. 10-30233

proceeding would have been different," with "a reasonable probability" defined as "a probability sufficient to undermine confidence in the outcome" of the trial.[13]

## III.

## A.

Under the first *Strickland* prong, this court must consider "the extent to which [defense counsel's] decisions were governed by a reasoned trial strategy."[14] "[T]he decision whether to put a Defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight."[15] Courts have rejected ineffective assistance of counsel claims based on failure to call the defendant as a witness where counsel reasonably thought that the defendant "might do himself more harm than good,"[16] and where the testimony would be merely cumulative.[17] At the same time, a "crucial distinction between strategic

---

[13] *Id.* at 694.

[14] *Richards v. Quarterman*, 566 F.3d 553, 566 (5th Cir. 2009).

[15] *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998) (quotation marks and citation omitted); *see also Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) ("[C]ounsel's decisions regarding examination and presentation of witnesses and testimony . . . fall within [the] category of trial strategy[,] which enjoys a strong presumption of effectiveness.").

[16] *Hollenbeck v. Estelle*, 672 F.2d 451, 454 (5th Cir. 1982) ("It was not unreasonable for counsel to conclude that Hollenbeck might do himself more harm than good by attempting to explain how six shots were fired in self-defense."); *see also Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) (finding that counsel made a reasonable strategic decision not to call the defendant as a witness where the defendant's testimony in an earlier trial had been highly prejudicial to him); *Schmidt v. United States*, 173 F.3d 846,1999 WL 220096, at *1 (2d Cir. 1999) (unpublished table decision) (holding that "counsel had a sound strategic reason for deciding not to call [a witness] to the stand, where "[the witness's] testimony, if consistent with the testimony he gave at [the defendant's] state trial . . . would have tended to undermine, rather than support, [the defendant's] sole defense").

[17] *Richards*, 566 F.3d at 568 ("[C]umulative testimony generally cannot be the basis of an ineffective assistance of counsel claim."); *Frederick v. Kyler,* 100 F. App'x 872, 874 (3d Cir. 2004) (unpublished) (per curiam) (finding that petitioner failed to satisfy the first *Strickland* prong in part because "[his] testimony would not have brought new information to the jury's attention").

No. 10-30233

judgment calls and plain omissions has echoed in the judgments of this court."[18] On the facts of this case, I am persuaded that the district court erred in its conclusion that counsel's failure to call the defendant to testify represented sound trial strategy.

At the evidentiary hearing, counsel gave two reasons for his failure to call Wines as a witness. First, counsel stated that "in [his] practice . . . individuals that tend to testify, a lot of times end up hanging themselves." However, he did not explain why he expected that Wines specifically would "end up hanging [himself]." Second, he noted that "[a] lot of times [a defendant's testimony] provides the state with the ammunition they need to convict someone" and suggested that in Wines's case "his prior conviction for a drug-related charge" would be that ammunition.

Advising a defendant in a drug trafficking case not to testify in order to prevent the government from cross-examining the defendant about an earlier drug-related conviction ordinarily "falls within the limits of reasonable trial strategy."[19] Were this an ordinary case, counsel's decision not to call Wines on that basis would most likely fall within the bounds of reasonable trial strategy. This case presented a unique scenario, however, in that the jury learned of Wines's earlier drug-related conviction from Wines's mother. Even if the risk that the jury would learn of Wines's prior conviction initially outweighed any possible benefit that might come from Wines's testifying, that risk was moot once

---

[18] *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992).

[19] *United States v. Orr*, 636 F.3d 944, 955 (8th Cir. 2011) (quotation marks and citation omitted); *see also United States v. Guerrero*, 157 F. App'x 995, 996 (9th Cir. 2005) (unpublished) (finding that it was objectively reasonable for counsel to advise the defendant not to testify "to avoid opening the door to impeachment with prejudicial evidence that had been previously suppressed").

24

No. 10-30233

Wines's mother described the prior drug offense during her testimony.[20] Counsel did not provide any explanation for his failure to reconsider the possibility of Wines testifying after Wines's mother provided the government with that ammunition.[21]

Counsel's failure to weigh the benefits versus risks of Wines's testifying is inexplicable given that counsel apparently *anticipated* that Wines's prior conviction might be revealed during Mrs. Wines's testimony. It would not have imposed a large burden on counsel to inquire into the specifics of Wines's potential testimony or prepare him to testify. If counsel had done so, he would have been in a position to make a strategic decision whether to call Wines to the stand after Wines's mother – as anticipated – informed the jury of Wines's criminal past. The record reveals no basis on which counsel could have concluded such preparation would be "fruitless" or "harmful."[22]

For those and at least four other reasons, I agree with the majority that counsel's failure to call Wines after Wines's mother revealed the past conviction

---

[20] *Cf. El-Tabech v. Hopkins*, 997 F.2d 386, 390 (8th Cir. 1993) (finding that counsel's decision not to call the defendant to the stand was not an unreasonable strategic decision in part because it "[was] likely that *additional* inculpatory evidence would have been admitted had [the defendant] testified" (emphasis added)).

[21] Although counsel identified only those two reasons for his failure to call Wines, he insinuated that there might be others, prefacing his remarks with the comment, "Well – some things necessarily are attorney-client privilege." But it is widely recognized that "[w]hen a habeas petitioner claims that he received ineffective assistance of counsel, he puts communications between himself and his attorney directly in issue, and thus by implication waives the attorney-client privilege with respect to those communications." *United States v. Pinson*, 584 F.3d 972, 977-78 (10th Cir. 2009) (citing, *inter alia*, *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967)). The government made no effort to probe counsel further regarding relevant communications, and it does not argue on appeal that counsel had objective reasons for failing to call Wines beyond those revealed by the current record.

[22] *Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (citing *Strickland*, 466 U.S. at 691).

was not a reasoned decision that served "a calculated trial strategy."[23]  First, while a decision not to call a witness, including the defendant, is generally a strategic judgment call, counsel cannot hide behind the mantle of trial strategy if the failure to call a witness reflects a failure to prepare.[24]  At the evidentiary hearing before the MJ, counsel could not specifically "recall [he and Wines] ever talking about [Wines] getting on the stand and testifying." Although counsel stated "that at some point [they] probably discussed it and [he] probably advised Wines against it," he did not indicate that they ever discussed the specifics of Wines's potential testimony. Wines stated that he and counsel never rehearsed his testimony.  Counsel did not state that he at any point weighed the potential risks of Wines testifying against potential benefits.[25]

Second, as summarized by counsel, "[t]he government's theory was Kenneth Wines was a big-time drug dealer and these guys worked for Kenneth Wines." Counsel explained that his "theory of defense"was "to refute the government's theory," and the record does not suggest that counsel had any indication that testimony from Wines would undermine this defense.

Third, Wines's testimony would not have been cumulative.[26]  At trial, the defense called only two witnesses, Wines's mother and Chappell.  Chappell asserted his Fifth Amendment privilege and refused to answer defense counsel's

---

[23] *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (quotation marks omitted) (quoting *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985)).

[24] *See id.*

[25] *See, e.g.*, *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) (concluding that it was objectively reasonable for trial counsel to decide that "the potential risks of [the defendant] testifying outweighed the potential benefits").

[26] *See Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009) ("[C]umulative testimony generally cannot be the basis of an ineffective assistance of counsel claim. The fact that there is 'some overlap' among the excluded testimony and what came out [at] trial will not necessarily preclude relief, however." (internal citations omitted)).

questions about the alleged offenses.  While Mrs. Wines provided her son with an alibi for the night before his arrest and testified that he was no longer living at the house on Blue Meadow, her testimony, taken as true, did not rule out the possibility that Wines still had some  connection to the house or that Woodson and Chappell worked for Wines in a drug trafficking conspiracy.

Fourth, nothing in the record suggests that Caldwell had reason to conclude that Wines's version of the facts would have fallen apart on cross-examination or that Wines's testimony would have been self-defeating.[27]

The government argues that counsel's failure to call Wines as a witness was an objectively reasonable strategic decision on two grounds.  First, the government maintains that regardless of Wines's mother's comments during her testimony, it would have been reasonable for counsel to advise Wines not to testify on the basis of his prior conviction. The government argues that Wines's mother "never mentioned a specific conviction," and that even though "the defendant's prior involvement with drugs was mentioned, there was no evidence of an actual specific conviction."  We are unconvinced.  While Mrs. Wines never stated explicitly that her son had a "prior drug conviction," her testimony made clear that Wines committed a prior drug offense, that Wines was "busted" for that offense, that the offense involved cocaine, and that Wines went to jail for the offense.  Further, counsel's concern that the jury would learn about the offense was not limited to a concern that the jury might learn about the "actual specific conviction," as opposed to Wines's past involvement in a drug-related crime.  Indeed, counsel hoped that Wines's mother would not mention the prior

---

[27] *See, e.g.*, *United States v. Harris*, 408 F.3d 186, 192 (5th Cir. 2005) (finding that counsel's failure to call the defendant to the stand was an objectively reasonable strategic decision in part because "[the defendant's] track record of testifying indicated he would make a remarkably bad witness for himself"); *Sayre*, 238 F.3d at 635 (concluding that "a reasonable attorney, considering [the defendant's] prior performance on the stand, could have decided that the potential risks of [the defendant] testifying outweighed the potential benefits").

offense because he believed that "[Wines's] prior criminal *conduct* would not be helpful in front of [the] jury" (emphasis added).[28]  The government does not explain why a reasonable attorney would draw a distinction between the information conveyed by Wines's mother and "evidence of an actual specific conviction" in this context.

Second, the government argues that counsel's strategy not to call Wines as a witness was reasonable because Wines's "description of what he would have testified to at trial was not necessarily consistent with the testimony of witnesses who had no motivation to contradict the defendant."  While Wines's description of what he would have testified to at trial will be relevant to the prejudice inquiry – and I will address it below – such evidence only bears on the first *Strickland* prong insofar as it indicates what counsel knew at the time.  The government notes (1) a minor inconsistency between Wines's testimony at the evidentiary hearing in 2010 and his mother's testimony at trial in 2004, and (2) a conflict between Wines's testimony and Lorene Smith's testimony.  With regard to the conflict between Wines's ultimate testimony at the evidentiary hearing and his mother's testimony at trial, there is no evidence that counsel reviewed Wines's potential testimony with him or that counsel was aware of the alleged inconsistency between Wines's account and his mother's.

---

[28] In a similar vein, a section of the MJ's Report and Recommendation that was adopted by the district court suggests that it was objectively reasonable for counsel to fail to call Wines as a witness to avoid the risk of the government entering formal evidence of Wines's prior conviction into the record because if the government had done so, "[the government] would have been entitled to jury instructions reminding the jury of Wines's prior conviction." *United States v. Wines* ("*Wines I*"), No. CR 03-30013-01, 2009 WL 5275839, at *6 (W.D. La. Oct. 26, 2009), *adopted in relevant part by Wines II*, 2010 WL 114225 (W.D. La. Jan. 11, 2010). That analysis turns on its head the function of the cautionary instruction.  We presume that juries follow the trial court's instructions. *See United States v. West*, 22 F.3d 586, 593 (5th Cir. 1994) (citing *Zafiro v. United States*, 506 U.S. 534, 540 (1993)).

The conflict between Wines's account and Smith's testimony is that Smith identified Wines as the "Tyrone Davis" to whom she rented the house on Blue Meadow, and Wines claims he has never used the alias "Tyrone Davis." Counsel's notes reflect that he was aware that Wines denied using the alias "Tyrone Davis." However, the jury already had to contend with conflicting evidence on this point, since Mrs. Wines testified that it was Wines's girlfriend who rented the residence on Blue Meadow and that Mrs. Wines "was with her" when she rented the residence. Moreover, since the defense theory was that Wines had lived at the residence on Blue Meadow previously, but had moved out several months before September 29, 2002, the question of whether Wines was or was not the Tyrone Davis who had originally rented the residence was not especially material. Contrary to the government's suggestion, there is no basis to conclude that the line "(?) Explain away Tyrone Davis?" in trial counsel's early notes on the case is evidence that counsel's advice to Wines not to testify was an objectively reasonable strategic decision.[29]

To provide constitutionally effective assistance, defense counsel must make strategic decisions based on the facts of the particular case and the characteristics of the particular defendant.[30] Moreover, counsel must not only formulate a reasonable trial strategy at the outset of the trial, but also revise that original strategy as necessary during the trial when assumptions underlying counsel's initial judgments prove wrong.[31] In sum, defense counsel

---

[29] Lorene Smith's ultimate testimony was inconsistent on several key points, which is perhaps why the government discusses the "Tyrone Davis" issue only briefly in addressing the first *Strickland* prong and does not even mention Smith's testimony in connection with the prejudice prong.

[30] *See Strickland*, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of *the particular case*, viewed *as of the time of counsel's conduct*." (emphasis added)).

[31] *See id.*

may not choose a trial strategy by default. Because the record reveals no objectively reasonable ground for not calling Wines as a witness after the jury learned of his prior drug offense, I conclude Wines has satisfied the first prong of the *Strickland* standard.

## B.

To establish prejudice under the second prong of the *Strickland* standard, a defendant must show that his counsel's unprofessional errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable."[32] When the defendant is challenging his conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[33] As the Supreme Court recently explained, this is a difficult standard to meet:

> *Strickland* asks whether it is "reasonably likely" the result would have been different. . . . This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." . . . The likelihood of a different result must be substantial, not just conceivable.[34]

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[35]

The MJ concluded that Wines could not demonstrate a reasonable probability that his testimony would have affected the outcome at trial for three reasons: (1) Wines's mother's testimony rebutted Woodson's testimony on the same points for which Wines claimed that his testimony was necessary; (2)

---

[32] *Id.* at 687.

[33] *Id.* at 695.

[34] *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) (citations omitted).

[35] *Strickland*, 466 U.S. at 696.

Wines's proposed testimony was "occasionally" inconsistent with his mother's testimony, and thus his testimony at trial might have weakened his case; and (3) Wines's credibility would have been impeached by his prior conviction if he had been called to the stand. In addition to the reasons cited by the MJ, the government suggests that "cross-examination by [defense counsel] of Woodson at trial did more to rebut Woodson's testimony concerning the overall conspiracy than any of the defendant's comments at the evidentiary hearing." These arguments do not withstand scrutiny.

First, while the record suggests that Wines's testimony would have overlapped with his mother's on some key points, Wines's description of the testimony he would have offered indicates that it would not have been merely cumulative. Wines indicated at the evidentiary hearing that he would have testified to his lack of involvement in the conspiracy – specifically that he had no connection to the site where the drugs and weapons that formed the basis for the charges against him were found and that he in no way participated in helping Chappell transport the drugs to Well Road.[36] In addition, Wines confirmed that he had indicated in certain letters referenced by the government that he was innocent and that the position he took in the letters was still his position. In those letters, Wines repeatedly affirmed his lack of involvement in the conspiracy, noting that he "didn't have anything to do with this crime."

Wines's testimony regarding his lack of connection to the house on Blue Meadow and lack of involvement in the conspiracy would have been especially important because the government argued to the jury that Mrs. Wines's testimony that she did not allow guns or drugs in her house in fact demonstrated

---

[36] The facts here are distinguishable, for instance, from those of *Harris*, in which the defendant "would not have offered any direct evidence concerning the [incident] outside of the evidence already adduced from [another witness's] testimony and cross-examination of the government's witnesses." *Harris*, 408 F.3d at 192-93.

"why [Wines] need[ed] the stash house" at 1651 Blue Meadow. This court previously has held that "counsel prejudices his client's defense when counsel fails to call a witness who is central to establishing the defense's theory-of-the-case, and the jury is thereby allowed to draw a negative inference from that witness's absence."[37] Beyond the Tyrone Davis receipt, there was no physical evidence connecting Wines to the house on Blue Meadow – and no physical evidence at all connecting him to the house during the time period when Chappell and Woodson were using it. Although counsel testified at the evidentiary hearing that he thought the prosecution's case was weak and that he could succeed in discrediting Woodson, the jury heard no evidence that actually rebutted the central points of Woodson's testimony.

Wines's testimony was central because the case came down to his word versus Woodson's, and the jury only heard from Woodson, who testified pursuant to a plea deal. Though Woodson had a more extensive criminal history than Wines and his testimony was riddled with inconsistencies, because Wines did not testify, the jury heard no direct evidence contradicting the central elements of Woodson's account. The government's suggestion that defense counsel's cross-examination of Woodson served as a more effective rebuttal of Woodson's account than Wines's testimony would have is without merit. The district court emphasized in its instructions to the jury that "statements, objections, or arguments made by lawyers are not evidence." While the cross-examination may have given the jury reason to be skeptical of Woodson's account, counsel's questions did not, by themselves, rebut that account.

Second, the inconsistency between Wines's testimony at the evidentiary hearing and his mother's testimony at trial was on a minor, peripheral point. The arguable inconsistency between Wines's testimony and his mother's

---

[37] *Harrison v. Quarterman*, 496 F.3d 419, 427 (5th Cir. 2007).

testimony is that Mrs. Wines stated that Woodson and Wines had planned to travel together to Monroe for the court appearance on September 30, 2002, and Wines suggested that it was a last-minute decision. This was not one of the key issues of the case. Moreover, as Wines points out in his brief, effective defense counsel could argue that an occasional inconsistency between the testimony of two witnesses indicates an absence of fabrication. Unlike the defendant in *United States v. Araujo*,[38] for instance, Wines has not proposed testimony that "appear[s] incredible."[39]

Third, although Wines's credibility could have been attacked on the basis of his prior conviction, Woodson's credibility would have been attacked on the same ground, and ultimately, the jury would be weighing Wines's credibility against Woodson's. The jury would have faced credibility choices between two felons, both testifying to avoid time in prison, not a felon and a police officer. This distinguishes the case from *United States v. Mullins*,[40] which the government cites in support of its claim that counsel's failure to call Wines as a witness did not prejudice the defense. In *Mullins*, the court found that "a denial by Mullins from the stand would [have] come at a high price" because "[i]t would have juxtapose[d] a police officer whose account [was] supported by [the defendant's] signed statement with a felon with a large incentive to lie."[41] Moreover, "counsel [in *Mullins*] offered the testimony of *several* other witnesses to challenge the police officer's testimony and support Mullins's story."[42] Here,

---

[38] 77 F. App'x 276 (5th Cir. 2003) (unpublished) (per curiam).

[39] *Id.* at 279 (finding that counsel's failure to call the defendant to testify did not prejudice him where "aspects of [the defendant's] proposed testimony appear[ed] incredible and would have been subject to vigorous and, in all likelihood, damaging cross-examination").

[40] 315 F.3d 449 (5th Cir. 2002).

[41] *Id.* at 456.

[42] *Id.* (emphasis added).

beyond Woodson, no witnesses – let alone law enforcement witnesses – offered direct evidence of Wines's involvement in the conspiracy. And Wines's mother was the sole witness who testified for the defense. The majority's contention that "Wines would have had to admit that he was in the illicit drug business" is inexplicable.

Fourth, if evidence of Wines's prior conviction had been admitted under Rule 609, the court would have issued a cautionary instruction to members of the jury, warning them that the prior conviction should be considered only in relation to Wines's credibility as a witness and not as proof that Wines was guilty of the current charges.[43] Because the jury did not receive a cautionary instruction after Mrs. Wines testified about her son's prior conviction, that instruction likely would have strengthened the defense's case.

Fifth, in his closing statement, defense counsel acknowledged that the government could impeach Mrs. Wines's by saying, "Well, that's because that's this boy's mama." He nonetheless asked the jury to believe that Mrs. Wines "didn't have any reason to lie," while leaving her testimony unsupported. On rebuttal, the government forcefully argued that the fact that Mrs. Wines was the defendant's mother gave her a very good reason to lie.[44]

Finally, this court has recited the everyman observation that "where the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."[45] Here, there was no question at trial that criminal activity

---

[43] *See* Fifth Circuit Pattern Jury Instructions (Criminal) 1.11 (2001).

[44] The prosecutor stated: "You know, I don't want to attack Mrs. Wines. But . . . if anyone has a reason to lie, she does too, you know. It's her baby that's on trial here. I'm not denying that. It's got to be hard. But the fact of the matter is her baby is running a criminal conspiracy selling crack cocaine . . . ."

[45] *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir.1985); *see United States v. Tavares*, 100 F.3d 995, 998 (D.C. Cir. 1996) (noting the applicability of this principle to the

took place; the only question was whether Wines was a participant in that criminal activity. As already noted, no part of Wines's proposed testimony appears incredible, and, as defense counsel himself emphasized, there were many reasons to disbelieve Woodson's testimony. While the government asserts that Wines's testimony at the evidentiary hearing "did not even address Woodson's descriptions of the conspiracy," the record does not support that assertion. Wines explicitly denied the key elements of Woodson's account – including Wines's alleged cooking of crack at the house on Blue Meadow the night before the arrests and Wines's alleged involvement in transporting the drugs in the truck driven by Chappell. Wines maintained his innocence with regard to the charges. Since Wines disclaimed any knowledge or involvement in the scheme, it is not clear what else he should have said to "address Woodson's descriptions of the conspiracy." Though the government had a chance to cross-examine Wines regarding his proposed testimony, it declined to press him on any of these points. The majority's contention that Wines "does not purport to deny" the alleged drug conspiracy is without foundation.

Indeed, to show that Wines was not prejudiced, the majority re-imagines the record, arguing that not only Wines's 1993 narcotics conviction but also a "whole clowder" of other convictions would have been introduced had Wines testified. The record offers no support for this assertion. The majority dismisses Wines's contention that some of the convictions listed in the PSR were not actually his and states that the convictions established a "pattern of his illegal behavior that would have been available to challenge the credibility of his innocence plea." But the neither the district court nor the magistrate judge found that any of those convictions would have been introduced or were likely to have been introduced had Wines testified. And the government has never

---

prejudice element of ineffective assistance of counsel claims); *Nichols v. Butler*, 953 F.2d 1550, 1553 (11th Cir. 1992) (same).

contended that it would have tried to introduce any of Wines's alleged other convictions.

In addition, the majority misapplies the *Federal Rules of Evidence*. The government cannot attempt to prove that a defendant is guilty by showing he was guilty of illegal behavior in the past.[46] While evidence of past convictions may sometimes be introduced to demonstrate that a testifying defendant is not a credible witness, there are limits on the use of such evidence. Under Rule 609, evidence of a prior conviction is admitted only if the conviction required proof of a dishonest or false statement,[47] or if the offense was punishable by death or imprisonment of more than one year and its  probative value outweighs its prejudicial value.[48] None of the post-1993 convictions listed in Wines's PSR resulted in a sentence of more than one year's imprisonment, and the record is silent as to whether any of the crimes was punishable by more than one year's imprisonment. It seems unlikely that a "false or dishonest statement" was an element of any of the listed offenses or that evidence of the convictions would be more probative than prejudicial. Using the PSR's list of prior offenses to justify its prediction that a jury would convict Wines regardless of his testimony, the majority signals its own conclusion about Wines's guilt – a conclusion infected by the very prejudice that the *Federal Rules of Evidence* guard against.

The majority also suggests that Wines was not prejudiced because the indictment included charges of a conspiracy "[b]eginning sometime in 1998" and Wines's testimony at the evidentiary hearing did not indicate that he could offer any defense that would have "addressed [the conspiracy] convictions" as they

---

[46] *See* FED. R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

[47] *Id.* 609(a)(2).

[48] *Id.* 609(a)(1).

related to the earlier period.  This makes little sense.  It is not the defendant's burden to rebut the government's charges, and the charges in an indictment are not evidence.  The question whether Wines was prejudiced by his lawyer's failure to call him as a witness turns on the relationship between his potential testimony and the evidence actually presented at the trial.  While the indictment charged a conspiracy beginning in 1998, the only evidence the government introduced as to the time period of the alleged conspiracy was Woodson's testimony that he and Wines had taken a number of trips over some period that began after Woodson encountered Wines at a gas station. Woodson also stated vaguely, on cross-examination, that when Wines enlisted his help he had not seen Wines for two or three years.  There was no indication that the alleged conspiracy began in 1998.

Indeed, during closing arguments, the government said that Woodson ran into Wines at the gas station "four months before they got arrested."   When it argued the conspiracy charges, the government said that Wines "had the dope, cooked the crack, and used [Chappell] and [Woodson] to move it up to Lake Providence; argued that "[t]he money always went back to [Wines]"; and noted the "seven and a half ounces of marijuana" found at the house on Blue Meadow – but made no mention of the time period.  If anything, the allegation that the conspiracy dated back to 1998, coupled with the lack of any evidence on that point, demonstrates the weakness of the government's case and the substantial probability that the jury would have acquitted had they been given an alternative to Woodson's testimony.

This is no easy case, and, as the MJ acknowledged in her opinion, "this is certainly not a case in which there was overwhelming evidence of guilt."[49] Because of the details of the potential testimony Wines described at the

---

[49] *Wines I*, 2009 WL 5275839, at *6.

No. 10-30233

evidentiary hearing, the lack of any other evidence rebutting key elements of Woodson's testimony, the gaps in Wines's mother's testimony, the fact that a defendant's testimony on his own behalf in a case like this one is uniquely influential, the absence from the record of any indication that Wines's testimony would be counterproductive or self-defeating given the circumstances, and the slenderness of the government's case against Wines, the reasonable conclusion is that Wines was prejudiced by counsel's failure to call Wines as a witness.

## IV.

Our review is de novo. Our charge demands a mastery of the facts – that the stage for the fateful decision be fully and accurately set. A Thornton Wilder set will not do. The majority opinion at best does not reflect such mastery; at worst, it is tendentious. While the *Strickland* standard is daunting, the facts of this case are unique. Given the unique facts, I am persuaded that Wines has demonstrated both that his counsel's performance was deficient and that he was prejudiced. I dissent.